The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. You may be seated. Bear with us. Your Honors, at the outset it's important to note that there's no dispute about whether or not there was a positive identification. There wasn't. Throughout the appellee's brief, they concede that. The lower court found that. There was an interrogatory question to the jury about whether or not the police officers had been told there wasn't a positive identification. Now, these issues are relevant that we present to that because, number one, when the jury has been charged with determining whether or not there is qualified immunity in the analysis so far as a reasonable officer would think that there was probable cause, the court cannot come behind it. And make another determination. Now, the court is appropriately here and they should have made the legal determination and that legal determination is whether or not the law was clearly established. But as to clearly established law, when there's a violation of someone's constitutional rights where they're arrested without probable cause, it's well settled that there usually will not be qualified immunity granted because it's presumed that most officers know. Well, and isn't it the defendant's burden to establish that something was clearly established and not your burden? Oh, absolutely, Your Honor. The interrogatory sort of had that reversed, didn't it? Yeah, that was a problem. It was like a double negative and it was very confusing. On the topic of the interrogatories, though, they're very troubling to me. I mean, I was the one who actually tried the case. And if you look in my brief, I could cite to the places but it's mentioned throughout that I had a conversation with the court about putting the interrogatories where they were in the first place. And the interrogatories are actually labeled for the jury and the jury was charged. These are to be used on the Maryland law determination about whether or not there's malice, et cetera. And my conversation with the court was about the placement of them. And it was clear that the court was not going to use them for the federal malicious prosecution. In fact, one could probably go as far as to say they would have been forbidden to be used because the jury was charged with resolving those issues. And also charged, thinking they were for the Maryland cause of action and charged with resolving the, whether or not it was reasonable for the officers to think there was probable cause alleged in the warrant. Also, the court gave the jury, when it made its determination that it wasn't reasonable for those officers, the court gave them three premises. And in those three premises were everything that was needed in order for them to determine that it would not have been reasonable. Okay. On the search warrant application and the false statement that was included in there about the positive identification, I understand Officer Smith signed the warrant affidavit so there's an easier tie-in with Officer Smith to that false search warrant application. But how would Officers Jones and Griffin be responsible for that? How do you propose we tie them to that? Absolutely, Your Honor. Officer Griffin was present when the statement was made that, at least the last time, there were numerous statements by the victim that she couldn't identify anyone. Not she couldn't identify the plaintiff or the appellant, anyone, absent seeing them in a lineup. So the fact that Griffin was there for one of those statements, the fact that Jones was there for one of those statements, and the fact that the testimony reflects and is reflected... Jones was also there for one of those? Yes, he was. All right. Do you know which time that was? Where in the... It's in the fact pattern, Your Honor. I believe it was the first one. All right. But on my rebuttal, I can answer that question definitively for you. Now... Can I ask you a question about the warrant affidavit? And this sort of... it's a kind of fundamental question that I'm confused about. Was your client arrested in public or in his home? He was arrested... he was at work and the police officer swarmed. So they didn't need a warrant to arrest him. They needed probable cause but not a warrant, right? You don't need a warrant to arrest someone outside a home. Well... So I don't understand why the warrant affidavit is relevant to the malicious prosecution claim. I mean, isn't the only question, they arrested him in public under the Fourth Amendment. For that to be reasonable, you need probable cause. So isn't the question whether they had probable cause and not whether the warrant was defective? They didn't need a warrant to arrest him. Your Honor, I do not believe that they could have arrested him absent a warrant. They did not witness any behavior. They would be going outside the scope of... You think you need a warrant to arrest someone in public? Absolutely. Okay. Counsel, are you sure about that? See, in this case, Judge Harris is asking about is that you had a composite flyer going around, right? Yes, Your Honor. Take this in steps, correct? Yes. And that was for someone who would be clearly a felon, the suspect, correct? Yes. And you're saying that you couldn't arrest a person who is believed to be a suspect felon when he or she matches the flyer that relates to that? You need a warrant? Well, Your Honor, the flyer itself is tainted because... I know that. And I'm saying I don't know, I'm agreeing with you, that's what I'm saying. I understand. But the question Judge Harris posed when she framed it, and very aptly so, why is the warrant, the dispositive aspect of that arrest in public, given the flyer, and it was a felony, and he was present, and the testimony didn't match what he believed to be the person. Now, that's another matter in terms of some validity in terms of that, perhaps, in this case. But why would you need the warrant? I assume this police officer was not connected who made the arrest, correct? That is correct. Someone who said, look, I'm on my beat, I'm in the vicinity of the alleged crime, or the crime, I don't think it's no question, but the lady was harping brutally, rape, so the crime, and then he matches it? You mean he can't make the collar? Your Honor, it's unclear from the warrant how that lead was generated. If you read the warrant... Yeah, that's another matter. I think that's another question that may have come up. You're right, it's not in the record what that might be, but that may be some... But is that your position, that without the warrant, that that arrest itself would be, could not be made? That is my position, Your Honor. If you look at all the, if you look at the facts of the case, and you look at the fact that, you know, she couldn't provide anything but a basic description of her assailant, about his race, his approximate age and approximate height. But counsel, let me just stop you, because I really do want to follow this. So, it seems to me that you're about to start talking about warrant or not, there wasn't probable cause for an arrest here. That's correct. Okay. Because then you were passed the warrant, and whether or not you need a warrant to make a public arrest, you certainly need probable cause. And so now you're about to argue that there is not probable cause. Yes. Okay. And the man had on a mask, and he was behind the victim at all times, even during the assault. Now, she was shown a picture on a cellular telephone of a man that Mr. Jones believed was the guy. We don't know if it was the appellant or not. I don't think that is something that we need to actually know. But what we do know is she was shown. We also know that she was shown during the composition of the composite sketch. We also know that there was video footage that was taken of the street, and the victim was on that street, and the police did not copy it. We also know that she didn't make a positive identification. We know that she said she couldn't identify anyone, anyone, without having the benefit of a lineup. She was told during all of these presentations of men that she was to pick someone. She was told what to write on the back. She was told to sign it. She was promised lineups. She wasn't given them. And even after, a few days after the arrest, she called up Jones and said, what's going on here? I was promised I would have lineups before anyone was arrested. I can't ID anyone. And he said, well, it's procedure to make arrests absent an identification. Now, that being said, she continued to follow up with Jones, thinking that he was communicating this information to the prosecutor. But lo and behold, what was going on is that Jones and the other appellees were suppressing DNA evidence. Was that the basis of the negligence claim? What about that part, the 13 months after the exculpatory DNA comes in and he's still sitting in jail? Is that the negligence claim? Well, the negligence claim was. What happened to that? This is just a factual question. So that seems like a very problematic thing. The problem with the negligence claim, Your Honor, is that the jury did find that there wasn't malice. But that was the basis for the negligence claim and it's out because of the finding about malice. Yes. But in terms of that, when you have DNA that's suppressed like that, this man was in solitary for months and months and months. And he deserves a federal remedy for that. Well, he does, but I. He doesn't have one. But I'm saying. I'm not asking my question right. It seems like you've got two things. You've got an arrest that you're saying was no good. And then you've got 13 months sitting in solitary while the police neglect to pass on the DNA evidence. I understand what happened below with the arrest claim. I'm trying to figure out what happened to the 13 month claim. So is this just a factual question? That was the underpinning of your negligence claim? Yes, but not the federal. Now, I believe that there should be a federal remedy. It's not a Brady violation unless you go to trial. And because he was released right before trial, he got to sit there for 15 months while they suppress the evidence. And he has no remedy. And I believe that under malicious prosecution, if that's not malicious prosecution. Well, you're so you're saying. But the jury passed on that. So you're I mean, I assume you got you. You think the jury got it right on the search warrant part and the award of damage. Oh, yeah. But then now you don't like what they did on malice. You either. I'm fine with what the jury did. The jury found that they were reckless or intentional. But it isn't an is an arrest. The 13 month thing. It's hard for me to see how that goes to malicious prosecution. I thought that malicious prosecution isn't one of the elements. Oh, I am sorry. Isn't one of the elements that the arrest be without probable cause for malicious prosecution? OK. So there's no way to get I. Is it your position that there is really no way to get at that 13 month thing in this case unless the arrest was without probable cause? Otherwise, the 13 months, there's just no way to address it. Well, I believe that they have an ongoing duty to inform the prosecutor and the prosecutor has an ongoing duty to investigate the case. No, I understand that you think it was wrong. What happened? I'm just asking you. I'm not phrasing my question. I believe the court. Let me assume hypothetically that 13 month thing was wrong. I am asking you, how can one get at it in this case if there was probable cause for the arrest? Is there any way to get at that 13 month thing? To get at it, honestly, the court would have to carve out an exception. I don't think an exception to the way that malicious prosecution is done. I think that that's just a measure of his damages. But with respect to the warrant, if I may just address that for one second here. Whether or not you're correct and I'm incorrect, and I will defer to you because I must. I don't have a choice. But it doesn't really matter in the end because there was no objection from the defendants. The jury was charged with what they had to determine and they determined it. They can't now benefit from something that they let ride that long. The criteria was whether or not the warrant application represented a falsehood. And they were charged with determining whether or not that falsehood was made intentionally or with reckless disregard for the appellant's rights. Beyond that, and I know I've run over just a little bit here. But beyond that, they were also charged with the information that they could not rule in his favor unless they found that a reasonable officer would not have believed that there was probable cause. So in the end, they're handcuffed, for lack of a better term, to this warrant issue. But even if they weren't, the jury on top of it found that a reasonable officer in their places would not have believed that there was probable cause for the appellant's arrest. So where that gets us is, I guess it sort of cleans up any loose ends that this court might find with the warrant issue. I guess that's all I have. All right. You have some time reserved on rebuttal. Liz Sangree. Good afternoon, Your Honors. Suzanne Sangree for the appellees. The court below properly held that the officer defendants were entitled to qualified immunity on the federal Section 1983 claim. The court applied the jury's fact findings to the law on qualified immunity and held that, quote, whether probable cause existed when Humbert was arrested, the officers were entitled to protection from close calls. That's what qualified immunity is for, so that police don't always fear making mistakes and getting sued. The court went on to find that the officers indeed had probable cause. In the fact that you need probable cause to arrest somebody, a close call, I mean, that's a given. You have to have, that's clearly established, right? You have to have probable cause to arrest somebody. Absolutely. All right. So how is it you think they had probable cause when you take this false statement out of the warrant application, whether there's a warrant or not? It's the statement that the victim made a positive identification is not a false statement. And the Braxton case from Maryland talks about that as really quibbling about semantics. What the facts underlying her identity... The jury found that it was. No, the jury did not find that that was a false statement. How did the victim positively identify him as her attacker when she repeatedly told them before this arrest, before, during, and after the arrest, that she could not positively identify him as her attacker? It was a positive identification under the law of probable cause, as Judge Quarles found, because the victim, who was a trained artist and who testified that she got a good look at his face before he put the mask on, she gave an accurate description of him that he fit. She also drew her own... She did draw her own, and that's not the sketch that was used. She was uncomfortable with the sketch that was actually used, based on a ridiculously generic description of a middle-aged, average-height black man in Baltimore City. No. She said that she made her own sketch right after the incident occurred, which helped to put his image in her mind. She was then told that police procedure requires the police sketch artist to do the composite sketch. So she worked with that police artist and helped to modify it. She kept changing things, and eventually she drew the nose in herself to make it accurate, and at the end she said, and she testified in court, and Judge Quarles mentions this in his opinion, that she was satisfied that this was the best sketch that could be produced. And, indeed, that sketch was then produced into a wanted poster, and it was circulated out in the community. And when a non-defendant officer, Lieutenant Shorter, who had seen the wanted poster, saw the defendant, saw Mr. Humbert on the street, and he recognized him as being the same person, he brought the wanted poster over to Mr. Humbert and showed it to him and said, is this you? And he initially said, yes, that's me. And then he testified in the civil trial in this case that he himself still didn't know whether that was a black-and-white photograph of him or whether that was a drawing of him. It so closely resembled him. That's interesting, probable cause, that you would walk up to somebody and say, is this you on this wanted poster? And they say yes. That might go the other way. No, the probable cause is that he not only fit the physical description that the victim had given, but he resembled the composite sketch that was produced with the victim participating, and the officer then saw that he resembled that sketch and identified him as a suspect in the case. And the evidence is clear. There's no conflict in the evidence below that that's the way he became a suspect in the case. His photograph ---- Is it your position that even without any ID at all by the victim, take out the photo ID, that's gone, even so there's still probable cause just based on resemblance to the composite sketch? There's no resemblance. There are numerous cases that we cite in our case and that Judge Quarles cites below as well. And, you know, so that alone would be enough for probable cause. Anyone who resembled? The police could have arrested anyone who resembled? When you have an accurate sketch that the victim helped to produce, and the officer sees that the person resembles that sketch very closely, as well as the physical ---- No. Well, let me tell you, in addition to the resemblance to the sketch and the accurate physical description, the suspect was found within a couple of blocks of where the crime had occurred. How many other male blacks in their early to mid-30s, 5'7 to 5'9, medium build, short hair, clean cut, blue T-shirt, were in that area of Baltimore City? Well, I'm not saying that that alone would be enough to arrest someone, but that that with the composite sketch, which the jury got to see, he came and testified and they saw the factual thing. He was found in the area of the crime, is it a week later? Yes, several days later. I don't even understand what that has to do with anything. It's one thing if you find him there right after the crime, but if you find him there days later, how is that even relevant? Well, that contributes to the probable cause, that he gave an address that was close in proximity and that he frequented the neighborhood and he was found in the neighborhood. That's one of the contributing factors. That certainly alone wouldn't be enough, but all of this combined. If you put the two together, that that's his address and you found him there, well, of course you did, he lives there. I just don't understand how the fact that you found him near the scene of the crime in his own neighborhood several days later adds anything at all to the picture, why that's not a zero. Well, I would say certainly it's just one of the contributing factors. It certainly wouldn't be enough on its own, but you add to that. You add to that. So it's that he resembles the sketch and he was found in the area where he lives. Very closely resembles the sketch, yes. And then add to that, because he resembled the sketch, Lieutenant Shorter took his photograph and then he was put into a photo array. I thought you were saying there was probable cause even without the photo array. I think there arguably is under the cases that we cite in our brief and that Judge Quarles cites as well. But add to that, his photo was put into a photo array. Now, the victim has seen two separate photo arrays before she sees the third one, and she has not positively identified any of the suspects depicted in those photo arrays. She gets to the photograph of Mr. Humbert in the third photo array, and she has a very emotional reaction. She exclaims, that's him, and points to it and is pushing it away. There's testimony she's covering her eyes. She's shaking. She's very upset by seeing this photo. So she did not have that reaction to any of the other photos she saw. She then signed. They said, okay, you need to write in your words. She wrote, and the jury credited that she was unprompted in her identification of him in the photo array and writing on the back. That's the only description of what happened there. She gave a very different account of what happened there, right? And she testified in front of the jury too, correct? Yes. And then the jury found in their verdict form, has Marlo Humbert proven that the victim stated to Dominic Griffin before Mr. Humbert's arrest that she could not positively identify him as her attacker? Yes. Yes. Yes. To all three officers. So the jury credited her testimony on that. The jury had to have credited her testimony on that. The jury also found in verdict sheet, at A212 on the verdict sheet, item number K was that she, upon seeing his photo in the photo array, the victim did not say, that's him, without prompting. The jury found that she was not prompted when she saw the photo and exclaimed, that's him. So the jury credited that as well. The jury also credited that she told the officer before Humbert was arrested that she couldn't be sure about the ID. And so what Judge Quarles did with that finding of fact is, you know, it's clear the evidence in the record is that she had testified that she said, you know, yes, that's him, and then later said that she wanted to see a lineup and to hear his voice in order to be sure that that was him. And so Judge Quarles said, well, a corrected warrant application would have said she made a positive ID and indicated she needed to see a lineup and hear his voice to be sure. And even on that corrected affidavit, that would have established probable cause to arrest him. Can I ask you just a quick question? I'm going back to what I was asking your colleague about. I mean, so you are conceding that if there was a Franks violation here, then that's enough to establish the malicious prosecution claim, that if this warrant was defective under Franks, there wasn't enough once you add in the district court, at least at points, seemed to be agreeing with the plaintiff that, look, if there was a Franks violation here, you prevail on your malicious prosecution claim. Is that your understanding too? No, that's not my understanding. I think the question before this court in the operative question is whether there was probable cause to arrest Mr. Humbert at the time that the warrant application was made. Did you argue that below? Yes. You did. Okay. Yes. And, in fact, the appellant conceded that the warrant was facially valid. And what he quibbles about was whether that statement that she had made a positive identification was an accurate statement given the facts, that she had stated, you know, that's him, but I want to be sure, in order to be sure, I need to see him and hear his voice. And if you look at the Waxman case from the Third Circuit, there the court says, and I can quote if I find in my notes, but I'll paraphrase, that certainly 100% positive identifications are the ideal, but that's not what is required at the investigatory stage. Counsel, what about from the very beginning? The officer, Jones, showed her a photograph on the phone and said, that's him. And she said that it looked very similar to the person that she was showing a picture of. So that's the problem in this case, and I think that's what she was honestly saying. Am I identifying a person that Officer Jones showed me or the person I believe? That's why she never was shown. Isn't that correct? You have to accept that that happened, right, because that's undisputed. Isn't that pretty outrageous, if that's the case, when you show someone a picture on the phone and say, that's him, before you even get to the composite? In a sense, doesn't it become like a dog and pony show after that? I would agree with you if those were the facts in this case, but those are not the facts in this case. That's not the fact that he showed? No. She testified that Jones showed her a photo on his cell phone at some point. She could not remember when that was. He told her, that's him. Was it before? And he told her, that's him. That's what she testified to. Well, that's undisputed. That is disputed. That is disputed. Jones said he couldn't recall whether he did or not. No, Jones said he didn't do that. But don't you accept that he did at this stage? No, no. I didn't know that. You're the moving party, aren't you, in terms of qualified immunity? Jones did not show her a photo on his cell phone. Aren't you the moving party? As to qualified immunity? No. We're the appellees who are defending Judge Quarles' decision to yes. We thought the jury was against you, and now we're having to take another layer. But you're saying that the fact is against you. That fact is against you. As a matter of fact, the jury found that she never positively identified it. Notwithstanding that she may have written that, they said there was never a positive identification. That's what the jury found. As a matter of fact. It seems like the judge, and that's another matter in terms of the judge's analysis of Delaware v. Franks, in terms of adding things to what he's, it's a subtraction, not an addition. No, and if you look at the jury's specific factual findings, they did find what would constitute a positive identification for purposes of establishing probable cause to arrest. All of the specific factual interrogatories, that she had participated in a composite sketch, which closely resembled him, that he was stopped within blocks of where the crime had taken place, that when she was shown the photo of him in the photo array book, she had a very serious emotional reaction and pointed and exclaimed, that's him. Because he looked like the person that was shown to her by Officer Jones. Is that a reference to be drawn? I refer you to appendix 261, note 46 of Judge Quarles' opinion, and that states that there was no evidence that she was shown the cell photo before the sketch was complete. And indeed, all of the evidence in the record... The sketch was complete, it doesn't matter. Then the evidence, no evidence, in progress is just as tainting. No, well, she was equivocating. She didn't say whether it was shown to her before... Or during. Or during or after. She couldn't place it. And so Judge Quarles said, yes. And so Judge Quarles said, I can't rely on that as evidence that it was done before or during. So when she equivocates there, it's not positive. But when she says before, during and after, I can't positively identify, then you're fine with that? No, well, she is saying that she's making what is qualified under the law as a positive identification, but then saying she wants to see him in a lineup and hear his voice in order to be absolutely sure. But before your time runs out, I want to just, what happened with this DNA evidence? The DNA evidence was submitted to the lab, and the results from the lab go directly to the state's attorney's office as they come directly to the officers as well. You're skipping over a lot. What was the result when it came back? The result was it excluded Mr. Humbert, meaning he didn't match the samples that they were able to get. So if he were a very sophisticated rapist, as the rapist in this case was, and used mask and condom and gloves and didn't leave any DNA, that wouldn't necessarily be conclusive. Is that why it wasn't forwarded to the prosecutors, because the police thought it wasn't conclusive? It was forwarded to the prosecutor, and Mr. Tam, Prosecutor Tam, acknowledges that in June of 2008 at the arraignment during a bench conference, and this evidence was in the civil trial here as well, he acknowledges that he knew the DNA did not match Mr. Humbert. And so he already knew that himself in June 2008. At that point, the case is in the hands of the prosecutor. The prosecutor is controlling the case. Can you just say that the police, the DNA might be wrong because it's a sophisticated, could be a sophisticated rapist? So that's the same argument. If the DNA is positive, then it's him. If the DNA is negative, well, then it still could be him. Well, it could be if there's other evidence to prove it, and a victim's ID would be enough to prove it. She didn't identify him. Well, she did as to probable cause to arrest. The facts, as found by Judge Quarles, established that. I just want to go back to the DNA. I'm sorry, because I can't. You said the prosecutor knew in June, but I don't remember what the time frame looks like. So how long did it take for the prosecutor to find out about the DNA evidence? So he was, Mr. Humbert was arrested in early May of 2008, and the arraignment was in June of 2008, and I could get you the exact dates. I don't know off the top of my head. And it was at that arraignment at a bench conference that the prosecutor acknowledged that he knew that the DNA. And the case was dismissed in May 2009? Yes. And so the prosecutor was proceeding on the victim's willingness to come and testify and her ID, and he had interviewed her. Really, the prosecutor's like, well, she did say she can't be sure. I need to see a lineup. And then the DNA came up negative, but I think I can make that case, so I'm going to keep him in jail for a year? Well, none of that is relevant to the issue that's here before the court today, which is what the officers knew at the time that they swore out the warrant for the arrest, of what the prosecutor was thinking after he had been arrested and the charges had been brought. But this seems like this is such a bad case, and even the district court judge said the probable cause question is really close. The district court said, have you guys tried to settle this case? I mean, is Baltimore pretty good with what happened here? Yeah, this is fine. Why can't you make this right? Actually, we do think that the officers acted right in this case. When you look at the whole picture of what happened here, the city feels like everything went the way it's supposed to go? I would say yes, but that really isn't the issue before this court. The issue before the court is what did the officers know when they swore out the arrest warrant? Why didn't they swore out the arrest warrant? Why isn't it what they knew when they arrested him? Right. Which is at the time that the arrest was authorized. And the defendant officers in this case were not the ones who actually arrested him. So what matters is what information did these investigators, the defendant officers, have when they applied for the arrest warrant and the arrest warrant was issued, which then caused his arrest. That was their participation in having him, you know, charges brought against him and prosecution ensued was swearing out the application for charges and arrest. So that's the issue before the court is what did they know at that time? And at that time they'd had this very emotional I.D. by an educated artist who was able to do a very accurate sketch, which the evidence is completely unconflicted that the only way that he became, Mr. Humbert became a suspect was when an officer on the street saw the sketch and saw that he matched the sketch and took his photo and put him into the photo array. That's how he became a suspect. And it's really, you know, there is. He said that's me in your wanted poster. And then he saw that it said rapist underneath. And he said, no, that's not me. But and even at trial at the civil trial, he acknowledged that he didn't know whether that was a sketch or a black and white photograph of him. It so resembled him. So why is this? I don't understand what weight we can attribute to that. Right. The DNA shows. I don't think putting to one side this extremely sophisticated rapist. But it sure seems like it wasn't him. And so what's the relevance of him looking at a sketch and saying, I don't know, that looks like. Well, I, I, I disagree that it wasn't necessarily him. She said that in order for her to be absolutely sure and be, you know, and have someone go to prison for a long time, that her she lost confidence in her I.D. as time went along. And she wanted to see him in a lineup and hear his voice. And because she never got that. And then she was continuing willing to test, come back and testify. And there were numerous postponements in the criminal trial to accommodate her travel schedule. But then when she heard that the DNA evidence didn't link him to the crime, she wasn't willing to come and testify anymore. So she was continuing, even as the months went on, to be confident in her I.D., so long as the DNA confirmed her I.D. But she wasn't willing to testify absent DNA evidence linking him. And there wasn't any DNA evidence linking, you know, about the crime that linked, linked to him. The court here was confronted with an inconsistent verdict. The special interrogatory fact findings were entirely consistent with each other, with one another, and with all of the general liability findings except for one. The one on the 1983 malicious prosecution claim, which was inconsistent with the special interrogatory fact findings. The court below did not abuse its discretion under Rule 49B3A, and it appropriately conformed the inconsistency in the general verdict to the facts as found in the written interrogatories. And I've run out of time, so I should end here. Unless you would grant me some additional time. You want additional time? Yes. Yes. The one last point that I would like to make is it would surely be absurd to require the court to take the jury's special interrogatory fact findings as to the state malicious prosecution claim, and then ignore those fact findings as to the federal malicious prosecution claim. The facts are the facts of the case, and they apply to all of the claims. And so it was the judge's duty to conform the jury's 1983 liability finding to the specific facts that they had found. Regarding all of the claims, including the state malicious prosecution claim. And he properly evaluated their individual facts concerning her identification, and said in his physical description and proximity, et cetera, and found that, yes, indeed, there was probable cause at the time that they swore out the warrant. Don't you find it disturbing that Officer Jones showed her on the phone and said, that's him? Don't you find that disturbing in the case? If that happened... You keep saying if, but at this point, don't we have to assume that it's a factual dispute at least, that it happened? It's a dispute in the evidence. She says it happened, he says it didn't happen. And the jury didn't make a specific fact finding about that. Their only specific fact finding was that she was unprompted in her I.D. in the photo array, which would indicate that she was not shown a suggestive photo before she viewed the photo array. I don't think that goes back to, was she recalling something she had been shown before? Yeah, so that's the closest the jury came to making a factual finding on that point. Otherwise, it's just conflicted testimony, and the court... In her mind, even though she didn't tell the officers, and credit to your side, but she said in her mind, she wasn't sure whether that's the person who looked like the one she was shown individually and told, that's him. Did she say that? Is that not the record? She did testify to that, and Judge Quarles said that she was so equivocal about her statements about that, that that didn't constitute evidence in his evaluation, that she was shown a suggestive photo before she made the photo I.D. in the array. That has nothing to do with suggestive photos. The question then is whether or not she's identifying someone who is singularly shown to her. That's a different question. Well, her testimony specifically was that she was upset when she saw the photo in the photo array, because it looked like the photo that Jones had shown her, and it looked like her assailant. It looked like her attacker. That's the very quintessential element of taint. Judge Quarles wasn't a jury. He sent it to a jury. But the jury didn't find that she had been tainted. The jury found that she never positively identified, notwithstanding that wrote him, because they understood, based on her testimony, it's him. Was him the person? She was identified. How do you ignore that? He did deny that he did that. No, he didn't. He testified that he did not recall. That's what I told you before. I'm sorry. I didn't understand. Okay, all right. Exactly what he said. It's undisputed then. When she says he did and he doesn't recall, that's undisputed. You agree with that? I agree with that, and then it's a matter of timing. Timing about when did he show it to her? It's clear. The question is what references in terms of the sketching aspect, but actually before she saw any book displayed, that had already happened. That's not disputed in the record, is it? You said the timing, is it? You know the record? It's not disputed that according to her, she was shown this photo, and there was no evidence to oppose it since Jones said he couldn't recall. And that happened before she saw any book photo spray. Correct. And that's the taint. That's why she said at trial. I don't know. And you would get a reaction, for example, police officer tells you that's him. You see a picture, what kind of emotion? Oh, he's in here, right? Well, there's no evidence that the photo that she says Jones showed her was Humbert. There's no evidence of that. She does not testify that that's the photo that she was seen. And she did testify that when she saw the photo array and she was upset and said that's him, she didn't tell the officers this, but she testified at court that she was upset because it looked like the photo Jones had shown her and it looked like her attacker. But what matters here is whether the officers thought that she had made a positive identification and her emotional reaction, her shaking, her exclamation, that's him, her writing, that's him was clearly sufficient to give them probable cause to swear out the warrant for his arrest. Thank you, Your Honors. Thank you so much. Thank you. With respect to what we just heard, much of it, I felt like I wasn't at that trial. It just seemed like there were so many mischaracterizations of facts. And that could just be a function of not being there or wishing that the facts were different. But the facts are pretty clear here. With respect to why there was an emotional reaction, I don't think that that takes much imagination. If someone who you trust, someone who's supposed to be there to protect you, says, I think this guy who looks sort of like the guy in the picture, we don't know how much. We do know that her original description could have matched any number of people in Baltimore City on any day. And in any major city, it was so generic that it was almost worthless. And for her to not be able to identify anything from the outset is important. It's also important that she said that even after this composite sketch was done, it was the best that that generic sketch could get. So, yes, she tweaked it a little bit, as best she could, but she was stuck with a generic sketch. She also said it looked nothing like her sketch or the input she had given him. Now... What happened to her original sketch? She told them that she had it, and they told her that they didn't want it. They gave it back to her and said they didn't want it? Yeah, they didn't want it. You all asked about settlement and if there was any settlement offer. Am I at liberty to tell you what the settlement offer was? No, maybe not. I don't think there was an inquiry, but let's move on with the substance of your argument. Can you talk about the 13 months? Is it true that the prosecutor knew right away, within a month, that the DNA evidence had come back? Is that established in the record? Well, he said informally, like he said informally, I've been told that we don't think the DNA matches. But he also said in his affidavit, I could not release him until the investigators gave me the reports. And he said, I kept asking them and I kept asking them. Now, here is the important part about that. Chris Jones characterized what went on as explainable by the Hatfields and the McCoys. The oldest feud or certainly the most serious that the United States has seen between two different families. And what he was saying was that we have a feud with the prosecutor. So we might have just kept it, just not given it to him. And he admitted thereafter that they should have produced it. This is really just a question. My recollection of the prosecutor's affidavit is similar to yours, that the prosecutor said, I would have dismissed this case as soon as I got the DNA report and I just didn't get it for a year. Despite the gist of it? Yeah, despite numerous requests to the, he called them the investigators. But yeah, despite that. Also, with respect to him knowing about the victim's inability to make an identification, he said he never knew about it until the final phone call. And that final phone call was when he said that there was no DNA and he said, I'm dropping the case. And she said, well, I guess it all makes sense now. I guess it really wasn't him. And that's in her affidavit. I just have a few more points here that I just wanted to clear up. The jury heard a multitude of evidence, things that weren't in those interrogatory questions. And they made their determination based on the entirety of the record. So to pick and cherry pick things that weren't even supposed to be used. And it's cited in my briefs, the law stating that when the issues are submitted to the jury, that that's the final inquiry. The judge can't double check it. You can't say, you know, well, there are these interrogatories that address some of the issues that are for a completely different cause of action. I want to turn back the clock. The jury heard information that would have made any identification tainted. And on the topic of tainted, we shouldn't forget that the second photo book, I hope you all will recall, had duplicates, some back to back, some with three, of the same man, of the same picture, which is incredible. If one is going to claim that they weren't doing anything fishy with an identification, the idea that you would stack a book like that is unexplainable. As to why the appellant was in the area, it was a week later. All the cases hold that, you know, there's a fire or something. And then there's a guy who matches the description, you know, in the same vicinity. For some reason my car alarm is going off. I apologize. Never had that happen in court before. He also testified that he had family and friends in the area, and that's why he was there. He was with a friend when he was walking down the street. As to him saying, that's me, to a wanted poster, I've never heard of anything like that. I've never heard of an officer that is... I have no recollection of it. If it is in the record, I would have trouble believing an officer would say, is that you? I don't know. Whether or not it was or wasn't said, I don't know. I will tell you that usually guys who think that they've committed a serious crime don't, or logic says they won't, let you take their picture afterward voluntarily, volunteer their DNA, whether or not they had on a mask or, you know, anything. That's not the behavior of someone who's committed a crime, and I think that that needs to be considered too, because that all goes into the evaluation. In terms of the identification itself, not only did Jones taint it with the photograph, directly, but every single time, every single time that she was there looking at photographs, she said, I can't identify anyone. It wasn't just about the appellant. And she did select other people that she wanted to see in a photo lineup and said the same thing. But she was always told, with the other two photo lineups, that she had to select someone. So the idea that she selected someone, I guess, isn't too surprising. And lastly, her reaction, I just want to close with this. You know, her reaction, she testified, was more severe than the other guys, because she was in shock during the other photo presentations. And on the third photo presentation, it had been eight days or something, and she testified she was in less shock, and that the guy really looked like the guy of the photo she was presented with. And I don't think that we can honestly sit here and have a conversation about what value the presentation of the photo books have to this case, or what value a composite sketch would have based on the fact that she was shown this photograph. It is inescapable. And if we sit here and we say that that's all right, and we sit here that we can excuse that kind of behavior, I find little, as I stand here, I find little more egregious in terms of setting the tone for police misconduct behind closed doors like this. It's not like police brutality, where you can oftentimes see the evidence. These cases are hard to prove, and in this case, it wasn't so hard to prove. But if we're going to excuse the kind of misconduct that is present here, that would not be in league with the well-settled law. It would be against public policy, and we're simply better than that. We're better than making excuses for all this stuff. People have rights. We give great deference to the police officers, and we have to. But at the end of the day, there is the Constitution, and it says that there has to be probable cause. And there is no way that they believed, individually or collectively, that there could be probable cause, given that this was so tainted, the presentations were so tainted, there's the issue of the photograph, and there's the issue of her flatly saying, I can't identify him or anyone else. And I think that goes to be a negative. Assuming that she did identify him for the sake of argument, her then saying, I can't identify him after seeing his picture, I think that bodes against an identification. And I think that would hold true to a composite as well. So I thank you for your time, and I hope there's a positive result here. But either way, I thank you for listening. Thank you, Mr. Edwards. We're going to ask the clerk to adjourn the court for today, and then come down and greet counsel.
judges: Roger L. Gregory, Stephanie D. Thacker, Pamela A. Harris